**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| AMY TAKALA and JENNIFER WESCOTT on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>NORDSTROM, INC.,<br><br>Defendant. | **Civil Action No.: 2:25-cv-1396-JHC**<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT** |

Plaintiffs Amy Takala and Jennifer Wescott ("Plaintiffs"), individually and on behalf of themselves and the Class defined below of similarly situated persons, alleges the following against Nordstrom, Inc. ("Defendant" or "Nordstrom") based upon personal knowledge with respect to themselves and on information and belief derived from, among other things, investigation of counsel and review of public documents as to all other matters:

## NATURE OF THE ACTION

1. It is both unfair and unlawful for entities like Nordstrom to impose discriminatory and punitive health insurance surcharges on employees who use tobacco products. This lawsuit challenges Nordstrom's unlawful practice of charging participants of the Nordstrom Welfare Benefit Plan (the "Plan") a "tobacco surcharge" without administering a compliant wellness program under the Employee Retirement Income Security Act of 1974 ("ERISA") and its implementing regulations governing wellness programs. Those regulations require that *every plan material* describing a premium differential must include a clear notice of the availability of a reasonable alternative standard, information for accessing the alternative standard, and a statement that the recommendations of participants' personal physician will be accommodated.

2. Nordstrom flouts those requirements. For years, the Benefit Guides actually provided to employees during open enrollment, which are the very materials participants rely on when deciding whether to enroll in coverage, did not contain the required disclosures. Meanwhile, Nordstrom's Summary Plan Description ("SPD") contains a different and incomplete version of those disclosures, buried on page 53 of a dense, single-spaced document that few participants will ever read or understand. This discrepancy between the SPD and the enrollment materials is not accidental; it reflects a deliberate effort to downplay participants' rights while maximizing the surcharges Nordstrom collects. Further, the SPD states that a refund will be issued only "if we determine a payroll refund is due," permissive language that obscures whether participants ever actually receive the "full reward" to which they are entitled under the law. Also, Nordstrom violates the regulatory requirement to provide proper contact information for the party responsible for administering the reasonable alternative standard by instructing participants to "contact your medical carrier" for help identifying an alternative standard. Together, these features demonstrate a program designed not to promote health, but to mislead participants, conceal their rights, and retain as much of the tobacco surcharge revenue as possible at the expense of employees and in direct violation of ERISA's nondiscrimination and fiduciary duty provisions.

3. Tobacco surcharges have become more prevalent in recent years but to be lawful plans can impose these surcharges only in connection with ***compliant*** "wellness programs," that satisfies strict conditions established by the Departments of Labor, Health and Human Services, and the Treasury (collectively, the "Departments") under ERISA. In 2014, the Departments jointly issued detailed regulations interpreting ERISA § 702, 29 U.S.C. § 1182, and Public Health Service Act ("PHSA") § 2705, 42 U.S.C. § 300gg-4, which prohibits discrimination in group health plans based on health status. These regulations set forth clear criteria that "***must*** be satisfied" for a

tobacco surcharge to fall within the safe harbor for health-contingent wellness programs. One of those core requirements is the obligation to provide participants with clear notice of the availability of a reasonable alternative standard and an express statement that the recommendations of a participant's personal physician will be accommodated in ***all plan materials*** discussing the surcharge. Failure to include this notice, for years, in the Benefit Guides that participants rely on during enrollment violates the wellness program rules and renders the program noncompliant.

4. The Departments' regulatory requirements are designed to ensure that wellness programs genuinely promote health and do not operate as a "subterfuge for discriminating based on a health factor." 29 C.F.R. § 2590.702(f)(4)(iii). To qualify as a compliant wellness program, employers must provide meaningful notice to participants, including contact information and a statement that the recommendations of the participant's personal physician will be accommodated. These notice obligations are essential because they ensure that participants are aware of all the available avenues by which they can avoid discriminatory surcharges. Defendant's wellness program fails this basic test. The Benefit Guides that are used by employees to make annual enrollment elections describe the tobacco surcharge and premium differential but omit any mention of: (1) access to the "full reward"; (2) contact information for accessing the alternative standard; or (3) that personal physician recommendations will be honored. By contrast, the SPD discusses these issues but the disclosures are misleading. This structural confusion and omission deprived participants of clear notice of their rights and resulted in unlawful surcharges that shifted healthcare costs onto employees without complying with ERISA's nondiscrimination rules.

5. The need for regulatory safeguards surrounding these types of wellness programs is underscored by studies showing little evidence that wellness programs effectively reduce healthcare costs through health improvement. Instead, the "savings" employers claim often result

in cost-shifting onto employees with higher health risks, disproportionately burdening low-income and vulnerable workers who end up subsidizing their healthier colleagues.[1] Without proper notice and transparent rules, these programs function less as health initiatives and more as revenue-generating schemes. That danger is increased when employers omit the mandatory disclosures that would allow employees to avoid surcharges through their physicians' recommendations in key enrollment materials like the Benefit Guides. The regulatory framework is designed precisely to prevent this kind of misuse by requiring plan sponsors to prove compliance once challenged, thereby ensuring that wellness programs serve health goals rather than simply penalizing those least able to shoulder extra costs.

6. Outcome-based programs,[2] such as smoking cessation programs, must offer a clearly defined "reasonable alternative standard" that allows "all similarly situated individuals" to avoid a surcharge if they are unable to meet the program's initial standard, such as certifying that they are tobacco-free. Critically, ERISA's implementing regulations require that plans clearly disclose the availability of a reasonable alternative standard *and* state that participants' personal physician recommendations will be accommodated.[3] These disclosures must appear ***in all plan***

---

[1] Horwitz, J. R., Kelly, B. D., & DiNardo, J. E. (2013). *Wellness incentives in the workplace: Cost savings through cost shifting to unhealthy workers*. Health Affairs, 32(3), 468–476, 474 ("wellness programs may undermine laws meant to prevent discrimination on the basis of health status. Since racial minorities and people with low socioeconomic status are more likely than others to have more health risks, they are also more likely to be adversely affected by cost shifting"); *see also* Dorilas, E., Hill, S. C., & Pesko, M. F. (2022). *Tobacco surcharges associated with reduced ACA marketplace enrollment*. Health Affairs, 41(3), Abstract (finding that tobacco surcharges are significant barriers to affordable health insurance).

[2] "An outcome-based wellness program is a type of health-contingent wellness program that requires an individual to attain or maintain a specific health outcome (such as not smoking or attaining certain results on biometric screenings) in order to obtain a reward." 29 C.F.R. § 2590.702(f)(1)(v).

[3] *Incentives for Nondiscriminatory Wellness Programs in Group Health Plans*, 78 Fed. Reg.

***materials that describe the terms of the wellness program***, not just the SPD.[4] As discussed, not all of Nordstrom's materials contain the proper information informing participants of their rights to all the various avenues to avoid the surcharge, leaving participants uncertain and unaware of their rights with respect to the surcharge. This omission deprived them of the notice they needed to avoid the surcharge, rendering the program noncompliant with ERISA's wellness regulations and reflecting a broader breach of fiduciary duty in administering the Plan.

7. Nordstrom is not entitled to take advantage of ERISA's statutory safe harbor because the wellness program fails to satisfy the mandatory regulatory requirements that *"must be satisfied"* for a premium differential based on a health factor to be lawful under ERISA. Final Regulations, 33160. A central deficiency of Defendant's program is that it fails to inform participants, in all Plan materials describing the surcharge, that their personal physician's recommendations will be accommodated. The Benefit Guides, which, upon information and belief, are the only documents distributed to employees during enrollment discussing the tobacco surcharge, describe that surcharge but omit the required disclosure altogether, leaving participants unaware of all the options available to them to avoid the surcharge. This omission violates the criteria for a compliant program outlined in the Final Regulations, which require that the disclosure appear in ***all*** materials that describe the terms of the program to ensure participants are fully aware of all of the avenues available to them to avoid the surcharge. Further, the permissive language

---

33158, 33163 (June 3, 2013) (hereinafter the "**Final Regulations**"); *see also* 29 C.F.R. § 2590.702(f)(4)(v).

[4] Final Regulations, 33166 ("For ERISA plans, wellness program terms (including the availability of any reasonable alternative standard) ***are generally required to be disclosed in the summary plan description (SPD), as well as in the applicable governing plan documents*** (which must be provided upon request), if compliance with the wellness program affects premiums, cost sharing, or other benefits under the terms of the plan." (emphasis added)).

regarding the reimbursement of surcharges already paid leaves participants uncertain as to whether they will actually be reimbursed upon completion of the program. These defects demonstrate that Defendant's program is not a compliant "program[] of health promotion and disease prevention" but instead a cost-shifting mechanism that unlawfully transfers healthcare costs to employees without satisfying the conditions necessary to invoke ERISA's safe harbor

8. Nordstrom bears the burden of proving that its wellness program fully complies with every regulatory requirement under ERISA, including providing a clearly defined, reasonable alternative standard in all Plan materials discussing the premiums differential that makes available the "full reward" for all similarly situated individuals. Nordstrom cannot meet this burden. It failed to provide notice of its availability in all plan materials discussing the surcharge. This failure to offer and communicate critical information regarding the alternative standard makes Nordstrom's surcharge facially unlawful under ERISA and no amount of *post hoc* justifications can cure this fundamental defect. Nordstrom's Plan is not a "program[] of health promotion or disease prevention" as required by ERISA but instead an impermissible cost-shifting scheme that unlawfully penalizes employees for their health status.

9. Plaintiffs are employees of Nordstrom who paid the unlawful tobacco surcharges to maintain health insurance coverage under the Plan. This surcharge imposed an additional financial burden on Plaintiffs and continues to impose such a burden on those similarly situated.

10. Plaintiffs bring this lawsuit individually and on behalf of all similarly situated Plan participants and beneficiaries, seeking to recover these unlawfully charged fees and for Plan-wide equitable relief to prevent Nordstrom from continuing to profit from its violations under 29 U.S.C. § 1109. Under 29 U.S.C. § 1109, Defendant is a fiduciary of the Plan who have a legal obligation to act in the best interests of Plan participants and to comply with federal law. Plaintiffs, on behalf

of themselves and the Plan as a whole, seek appropriate equitable relief under 29 U.S.C. §§ 1132(a)(2) and (a)(3) to address Defendant's ongoing violations of ERISA's anti-discrimination provisions.

## PARTIES

11. Plaintiff Amy Takala is, and at all times mentioned herein was, an individual citizen of the State of Washington residing in the County of Pierce. Plaintiff Takala is an employee of Nordstrom, who paid a tobacco surcharge associated with the health insurance offered through Nordstrom during her employment. Plaintiff Takala was required to pay this tobacco surcharge to maintain health insurance under the Plan.

12. Plaintiff Jennifer Wescott is, and at all times mentioned herein was, an individual citizen of the State of Washington residing in the County of Pierce. Plaintiff Wescott is an employee of Nordstrom, who paid a tobacco surcharge associated with the health insurance offered through Nordstrom during her employment. Plaintiff Wescott was required to pay this tobacco surcharge to maintain health insurance under the Plan.

13. Plaintiffs are participants in the Plan pursuant to 29 U.S.C. § 1002(7).

14. Nordstrom is a luxury department store chain with location across the country that generate billions of dollars in revenue annually. Nordstrom is a Washington corporation with its headquarters in Seattle, Washington.

15. Nordstrom is the sponsor of the Plan and the Plan Administrator under 29 U.S.C. § 1002(16). As of February 2024, there were over 62,000 participants in the Plan. Nordstrom's employee benefit plan is subject to the provisions and statutory requirements of ERISA pursuant to 29 U.S.C. § 1002(3).

## JURISDICTION AND VENUE

16. The Court has subject matter jurisdiction pursuant to 29 U.S.C. §1132(e)(1) and § 28 U.S.C. 1331, as this suit seeks relief under ERISA, a federal statute. It also has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Upon information and belief, the number of class members is over 100, many of whom have different citizenship from Defendant. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

17. This Court has personal jurisdiction over Defendant because it is headquartered in this District. Defendant has purposefully availed itself of the privilege of conducting business in Washington.

18. Venue is proper in this District under 2 U.S.C. 1132§ (e)(2) because Defendant is headquartered in this District and this is a District in which Defendant may be found.

## FACTUAL BACKGROUND

### I. DEFENDANT'S TOBACCO SURCHARGE VIOLATES ERISA'S ANTI-DISCRIMINATION RULE

#### A. Statutory and Regulatory Requirements

19. To expand access to affordable health insurance coverage, the Affordable Care Act ("ACA") amended ERISA to prohibit any health insurer or medical plan from discriminating against participants in providing coverage or charging premiums based on a "health-related factor," including tobacco use. Under this rule, a plan "may not require any individual (as a condition of enrollment or continued enrollment under the plan) to pay a premium or contribution that is greater than such premium or contribution for a similarly situated individual enrolled in the plan based on any health-related factor in relation to the individual or to an individual enrolled under the plan as a dependent of the individual." ERISA § 702(b)(1), 29 U.S.C. § 1182(b)(1).

20. The statute permits group health plans to "establish[] premium discounts or rebates . . . in return for adherence to ***programs of health promotion and disease prevention***" (29 U.S.C. § 1182(b)(2)(B)(emphasis added)); however, these "wellness programs"—to qualify for this statutory safe-harbor exception—must strictly adhere to the mandated regulatory requirements.

21. Under ERISA § 505, 29 U.S.C. § 1135, Congress granted the Department of Labor the authority to issue regulations, including the power to establish regulations prohibiting discrimination against participants and beneficiaries based on their health status under ERISA § 702, 29 U.S.C. § 1182. This authority empowers the Secretary of Labor (the "Secretary") to "prescribe such regulations as he finds necessary or appropriate to carry out the provisions of" Title I of ERISA. (29 U.S.C. § 1135). Furthermore, ERISA § 734, 29 U.S.C. § 1191c, explicitly reinforces the Secretary's authority to issue regulations concerning group health plan requirements, which grants the power to "promulgate such regulations as may be necessary or appropriate to carry out the provisions" of ERISA Title I, Part 7. 29 U.S.C. § 1191c.

22. Exercising this delegated authority, in 2006, the Secretary issued regulations through the notice-and-comment rulemaking process outlining the criteria that a wellness program must meet to qualify for the premium non-discrimination exception under ERISA § 702(b). *See* Final Regulations, 33158–59. Following the amendments by the Affordable Care and Public Health Service Acts in 2010, the Departments, published proposed regulations in November 2012 to "amend the 2006 regulations regarding nondiscriminatory wellness programs." *Id.*, 33159. These regulations (i.e., the Final Regulations) were approved and signed in 2013 to be effective January 1, 2014. *Id.*, 33158.

23. The Final Regulations specify that health promotion or disease prevention programs, such as outcome-based wellness initiatives (i.e., smoking cessation programs), must meet detailed requirements to qualify for the safe harbor. As the Departments explained, these criteria "***must be satisfied*** in order for the plan or issuer to qualify for an exception to the prohibition on discrimination based on health status." *Id.*, 33163. "That is," the Departments explained, "these rules set forth criteria for an ***affirmative defense*** that can be used by plans and issuers in response to a claim that the plan or issuer discriminated" against participants. *Id.* (emphasis added). That means once a participant alleges a discriminatory surcharge, the burden shifts to the employer to prove that the surcharge is non-discriminatory because the wellness plan qualifies as a "program[] of health promotion and disease prevention" that satisfies *all* the necessary regulatory criteria.

24. Compliance with the regulatory criteria is not optional. These criteria serve as the standard by which these wellness programs can be evaluated and are the only lawful pathway for plans to impose health-based premium differentials without violating ERISA's anti-discrimination provisions. *See* Final Regulations, 33160 ("***these [F]inal [R]egulations set forth criteria for a program of health promotion or disease prevention*** . . . that ***must be satisfied*** in order for the plan or issuer to qualify for an exception to the prohibition on discrimination . . . ." (emphases added)).

25. Only by satisfying all of the criteria, can employers ensure their plans are wellness programs and "not a subterfuge for underwriting or reducing benefits based on health status." *Id.* As one court concluded, in a tobacco surcharge case, regarding an employer's obligation to satisfy the regulatory criteria, "[a]ll means all… no matter how small the requirement may be." *Chirinian v. Travelers Co.*, No. 24-cv-3956, 2025 U.S. Dist. LEXIS 144669, at *28 (D. Minn. July 29, 2025).

26. The criteria provide guidelines for employers to prevent them from using surcharges as a revenue-generating mechanism dressed up as a program of health promotion. If a program fails to meet even one of these requirements, the program does not qualify as a "program[] of health promotion" and cannot qualify under ERISA's statutory carve-out. In that case, any premium differentials imposed based on a health factor violate the statute's anti-discrimination provisions. *See* § 2590.702(f)(4) (describing the "[r]equirements for outcome-based wellness programs," stating that a program "does not violate the provisions of this section ***only if <u>all</u> of the [] requirements are satisfied***." (emphasis added)).[5] In sum, a wellness program that fails to satisfy each criterion is not a legitimate health promotion initiative but an unlawful penalty that discriminates based on health status, in direct violation of ERISA's protections.[6]

**B. Regulatory Criteria**

[5] Congress codified parts of the 2006 regulations regulatory criteria when, through the Patient Protection Act ("PPA") and ACA, it amended the PHSA, and incorporated (nearly verbatim) the regulatory language into ERISA. *See* 42 U.S.C. § 300gg-4(j)(3); 29 U.S.C. § 1185d(a)(1) ("[T]he provisions of part A of title XXVII of the [PHSA] [42 U.S.C. § 300gg *et seq*.] (as amended by the [PPA and ACA]) shall apply to group health plans, and health insurance issuers providing health insurance coverage in connection with group health plans, as if included in this subpart[.]"). Since then, the Departments have, in accordance with the they were granted, updated the regulatory framework through the Final Regulations, refining and clarifying the requirements to ensure compliance with ERISA's nondiscrimination provisions and the statutory criteria established by Congress. *See* 42 U.S.C. § 300gg-4(n) ("Nothing in this section shall be construed as prohibiting the Secretaries of Labor, Health and Human Services, or the Treasury from promulgating regulations in connection with this section"); *see also* 45 C.F.R. § 146.121(f) (adopting identical language to § 2590.702(f)).

[6] Congress adopted these regulatory criteria when, through the Patient Protection and Affordable Care Act, it amended the Public Health Service Act, incorporating these criteria into ERISA. *See* 42 U.S.C. § 300gg-4(j)(3); 29 U.S.C. § 1185d(a)(1) ("[T]he provisions of part A of title XXVII of the Public Health Service Act [42 U.S.C. § 300gg *et seq*.] (as amended by the Patient Protection and Affordable Care Act) shall apply to group health plans, and health insurance issuers providing health insurance coverage in connection with group health plans, as if included in this subpart[.]").

27. To comply with ERISA and avoid unlawful discriminatory surcharges, outcome-based wellness programs must meet the following five (5) criteria:

(a) Frequency of opportunity to qualify: Participants must be given at least one chance annually to qualify for the reward associated with the program to ensure ongoing accessibility and fairness. 29 C.F.R. § 2590.702(f)(4)(i).

(b) Size of reward: penalties or rewards cannot exceed 50% of the cost of employee-only coverage. § 2590.702(f)(4)(ii)

(c) Reasonable design: programs must be "reasonably designed" to promote health and cannot be "a subterfuge for discriminating based on a health factor." This determination is based on all the relevant facts and circumstances. "To ensure that an outcome-based wellness program is reasonably designed to improve health and does not act as a subterfuge for underwriting or reducing benefits based on a health factor, a reasonable alternative standard to qualify for the reward must be provided to any individual who does not meet the initial standard based on a measurement, test, or screening. . . ." § 2590.702(f)(4)(iii)).

(d) Uniform availability and reasonable alternative standards: "The ***full reward*** under the outcome-based wellness program must be available to ***all similarly situated individuals***." 29 C.F.R. § 2590.702(f)(4)(iv).

(e) Notice Requirement: "The plan must disclose in all plan materials describing the terms of the program ***the availability of other means of qualifying for the [full] reward***." Final Regulations, 33159 (emphasis added).

28. The Departments have explained that ERISA's wellness program rules are designed to *promote health without enabling discrimination*. The Final Regulations reflect this intent by requiring that any program imposing a premium differential, such as a tobacco surcharge, must provide participants with a genuine and recurring opportunity to avoid the surcharge by satisfying a reasonable alternative standard.

29. The once-per-year requirement was adopted as a bright-line rule to ensure that participants have a *meaningful* opportunity to qualify for the full value of the reward. Plans must give participants an opportunity at least once every twelve months to meet an alternative standard—whenever that occurs during the plan year—and receive the *same full reward* as those who meet the initial standard (i.e., non-smokers). Final Regulations, 33163 ("while an individual may take some time to request, establish, and satisfy a reasonable alternative standard, the same, full reward must be provided to that individual as is provided to individuals who meet the initial standard ***for that plan year***." (emphasis added)). Employers have flexibility with regards to *access* to the alternative standard. They can, for example, provide access once a year (assuming the window complies with the reasonableness requirements), for three months, four months, or throughout the plan year. What they cannot do is reduce the value of the reward for participants based on when they satisfy the standard.

30. The Departments have made clear that every participant must receive "the *same, full reward*" for satisfying the reasonable alternative standard, even if the individual completes that standard midyear.[7] A compliant plan must therefore make the reward available retroactively

[7] "The intention of the Departments . . . that, regardless of the type of wellness program, ***every individual*** participating in the program should be able to receive the ***full amount of any reward or incentive***. . . ." Final Regulations, 33165 (emphases added); *see id.*, 33163 ("While an individual may take some time to request, establish, and satisfy a reasonable alternative standard, ***the same,***

or otherwise ensure that the value of the reward is identical for all similarly situated participants. Failure to do so violates ERISA's nondiscrimination rules.

31. For health contingent wellness programs, the DOL Regulations require the notice be disclosed "in all plan materials describing the terms of" the program. 29 C.F.R. § 2590.702(f)(3) and (4) (emphasis added); *see also* 42 U.S.C § 300gg-4(j)(3)(E). Plans that describe surcharges in enrollment materials without including the required notice violate this rule and fail to qualify for the statutory safe harbor. The Departments explained that while materials that merely "mention" a program, without describing its terms, need not include the notice, any plan materials that reference a *premium differential based on tobacco use* or other health-contingent standard ***must*** contain the required disclosure. Final Regulations, 33166 ("a plan disclosure that references a premium differential based on tobacco use … is a disclosure describing the terms of a health-contingent wellness program and, therefore, must include this disclosure."). Thus, enrollment materials or benefit guides that reference higher premiums or surcharges based on tobacco use, but omit the required disclosure notice—including omitting contact information and a statement that a participant's physician's recommendations will be accommodated—violate this rule.

32. These requirements exist precisely to prevent employers from including these disclosures in some plan materials but then excluding that information from materials that participants rely upon when making decisions about their healthcare. Employers that bury this language in SPD—a dense, single-spaced document that employees are unlikely to see during enrollment—and omit it altogether from their benefit guides run directly contrary to the

***full reward must be provided to that individual as is provided to individuals who meet the initial standard for that plan year***.").

Departments' guidance and fail to provide the notice necessary to make informed enrollment decisions.

33. Nordstrom imposes a premium differential without providing the required notice in their benefit guides. Failing to notify participants of all the avenues available to them to avoid the surcharge in key enrollment documents, like the benefits guides, deprives participants of their statutory rights and prevents them from knowing that satisfying the alternative standard can result in them receiving "the same, full reward."

34. Nordstrom's tobacco surcharge is unlawful because it imposes a premium differential without the required notice in all Plan materials discussing the surcharge. Further, under Nordstrom's Plan, participants are defaulted into tobacco-user status unless they opt out and conditions reimbursement on timing and administrative discretion. These features, collectively, obstruct and hinder participants from receiving "the same, full reward" and deprives them of their rights to know all possible avenues to avoid the surcharge. As discussed, the Final Regulations provide that outcome-based wellness programs, such as those involving tobacco cessation programs, are permissible under ERISA ***only if all regulatory requirements are satisfied***. *See* 29 C.F.R. § 2590.702(f)(4). Here, those conditions are not satisfied.

## II. DEFENDANT CANNOT AVAIL ITSELF OF ERISA'S SAFE HARBOR

35. Nordstrom's tobacco surcharge is unlawful and discriminatory because it fails to comply with the Final Regulations governing tobacco surcharges and wellness programs. To qualify for ERISA's safe harbor under § 1182(b)(2)(B), a wellness program must clearly disclose a reasonable alternative standard that guarantees that all who satisfy the standard receive the same full reward and provide *meaningful* notice in *all* plan materials discussing the premium differential,

including contact information to access the alternative standard and a statement that participants' physicians' accommodations will be accommodated. Nordstrom's Plan fails these requirements.

36. Nordstrom's program imposes a $20 twice-monthly "Tobacco Use Surcharge" automatically on all employees and their families who enroll in its health plan *unless* they affirmatively attest to being tobacco-free. Nordstrom's SPD does not make clear that participants who satisfy the alternative standard will receive the full reward. Instead, the SPD states: "If based your change [in tobacco-use status] we determine a payroll refund is due 10 you, a refund will be processed within 60 days of your completed change in tobacco status." This language is misleadingly permissive, conditioning reimbursement on Nordstrom's discretionary "determination" that a refund is "due," rather than affirmatively guaranteeing that participants who complete the reasonable alternative standard will *receive* the full reward. Such phrasing undermines the mandatory nature of the reward required by law and renders the disclosure misleading.

37. Further compounding the deficiencies in its notice, Nordstrom makes it nearly impossible for participants to even discover the existence of the cessation program or the possibility of a refund. Upon information and belief, participants are required to complete enrollment electronically, often using their cellphones. The SPD that discusses the tobacco surcharge is a sprawling, single-spaced document of more than five hundred tabs to click through, with no hyperlinks or tab to navigate directly to any "tobacco" or "cessation" section. Rather, the relevant language appears only once—on page 53 of this 500+ page document—under a misleading header titled "Resources to Stay Healthy." The SPD's table of contents and glossary contain no reference whatsoever to the tobacco surcharge, and the single page addressing the issue

is inaccessible without scrolling through hundreds of screens. Most participants could not reasonably be expected to locate, much less interpret, this buried provision.

38. Neither Plaintiff recalls ever receiving or reviewing a 500+ page document at enrollment, nor would it have been feasible for a typical participant to do so. Nordstrom's Benefit Guides—the materials employees actually view during open enrollment—make no meaningful mention of participants' right to a reasonable alternative standard or the role of their personal physician, as indicated below, which is found on page 18 of the 2024 Benefit Guide:

YOUR PAY PERIOD RATES

**Medical/Vision and Dental Rates**

Nordstrom shares the cost of your medical and dental care with you with Nordstrom covering a majority of the costs. The rates below reflect your cost and are effective March 1, 2024 - February 28, 2025. If you enroll in a medical plan, vision is included at no additional cost.

Here's additional important rate information:

- The rates below do not include the Tobacco Use Surcharge. There is a surcharge of $20 twice-monthly if you, your spouse/registered domestic partner or adult child (age 18-26) are eligible and enroll for a Nordstrom medical plan and use tobacco products.
- The rates below do not include the Spousal/Domestic Partner Surcharge. There is a surcharge of $50 twice-monthly if your spouse/domestic partner is eligible for another employer sponsored medical plan.
- Employees enrolling in the medical plan will be required to complete a Health Care Surcharge Acknowledgment Form as part of the enrollment process.
- Medical/Dental/Vision deductions are only taken from 2 paychecks per month (24 paychecks per year).

39. As shown above, while Nordstrom's materials reference a premium differential for participants who use tobacco, they contain *no* discussion of any reasonable alternative standard, *no* contact information for accessing such a standard, and *no* language whatsoever regarding physician accommodation. Nordstrom plainly knew how to include this information, as its 2022 SPD included portions of it buried on page 53. Yet, Nordstrom did not add any reference to an alternative standard—or to the role of a participant's physician—in its benefit guides until 2025, when it quietly inserted limited language, as shown below:

# YOUR PAY PERIOD RATES

**Medical, Dental, and Vision Rates**

Nordstrom shares the cost of your medical and dental care with you with Nordstrom covering a majority of the costs. The rates below reflect your cost and are effective March 1, 2025 - February 28, 2026.

Here's additional important rate information:

- The rates below do not include the Tobacco Use Surcharge. There is a surcharge of $20 twice monthly if you or your spouse/registered domestic partner are eligible and enroll for a Nordstrom medical plan and use tobacco products. Nordstrom is committed to helping you achieve your best health. To remove the Tobacco Use Surcharge, tobacco users must become tobacco free or enroll in an approved tobacco cessation program (at no cost). If you are unable to meet the tobacco cessation program requirement, you may qualify for an opportunity to remove the surcharge by different means. Please contact your medical carrier and they will work with you (and if you wish, your doctor) to find an alternative program that will allow you to qualify for a waiver of the surcharge.
- The rates below do not include the Spousal/Domestic Partner Surcharge. There is a surcharge of $50 twice-monthly if your spouse/domestic partner is eligible for another employer sponsored medical plan.
- Medical, dental, and vision deductions are only taken from 2 paychecks per month (24 paychecks per year).

As shown above, even when Nordstrom updated the disclosure in the benefit guide, it was deficient. The 2025 Benefit Guide merely states: "To remove the Tobacco Use Surcharge, tobacco users must become tobacco free or enroll in an approved tobacco cessation program (at no cost)." This statement fails to inform participants that they are entitled to receive the *full reward* upon completion of the program and omits any explanation that completion is required. It also provides no contact information for participants to access or enroll in the purported program.

40. The discrepancy between Nordstrom's SPD and its benefit guides directly violates the Departments' guidance, which explains that any plan material referencing a premium differential based on tobacco use must include the mandatory reasonable-alternative-standard notice. Final Regulations, 33173 ("these final regulations … require plans and issuers to disclose the availability of a reasonable alternative standard to qualify for the reward … ***in all plan materials*** describing the terms of" the program). By burying a single, incomplete reference on

page 53 of a 500+ page electronic SPD, while omitting it entirely from the benefit guides that describe the surcharge, Nordstrom provides no meaningful notice.[8]

41. Nordstrom's own text underscores and adds to the confusion. The SPD provides: "you may be eligible for a refund … if you enroll in a Tobacco Cessation Program ***and*** submit a change … prior to the end of the plan year." This language is misleading in multiple respects. It conditions relief on *both* enrolling in a cessation program *and* submitting a change in tobacco-use status, suggesting that participants must actually stop using tobacco before becoming eligible for reimbursement. At minimum, it implies that continued tobacco use disqualifies participants from receiving the reward, even if they complete the reasonable alternative standard. The provision thus conceals participants' statutory right to the "full reward" upon completion of the alternative standard and instead portrays cessation itself as the only path to relief. Moreover, it does not guarantee a refund at all, stating only that participants "may be eligible." This phrasing would lead a reasonable participant to believe that the only way to avoid the surcharge is to *quit smoking entirely*, the very misunderstanding the Final Regulations are designed to prevent.

42. Further, the SPD directs participants to "contact your medical carrier" to explore cessation options, rather than providing the contact information for the Plan Administrator or wellness-program representative responsible for administering the reasonable alternative standard. This instruction violates 29 C.F.R. § 2590.702(f)(4)(v), which requires that notices include *contact*

---

[8] Merriam-Webster defines "notice" as giving someone "formal notice" or ensuring others "become aware of (something or someone)." *See Notice*, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/notice (last visited October 7, 2025). A disclosure buried dozens of screens deep in a lengthy electronic document, without any corresponding index entry, table-of-contents reference, or hyperlink, cannot reasonably be considered meaningful or effective notice. Such an approach defeats the very purpose of disclosure by ensuring that the critical information, while technically present, is functionally invisible to the ordinary participant.

*information* for obtaining the alternative. Nordstrom's redirection to an external "medical carrier" with no corresponding telephone, email, or other contact information creates an additional barrier that frustrates access to the alternative standard and further undermines compliance.

43. The result is that most participants, including the Plaintiffs, had no idea a tobacco cessation program existed or that completing it could remove or refund the surcharge. Nordstrom's design—requiring electronic enrollment through a 500-page, non-navigable SPD; omitting the disclosure from the benefit guides; and relying on permissive, confusing language—was intended to ensure that as few participants as possible discovered their rights. Every participant who remained unaware or failed to pursue the cessation program meant more surcharge revenue for Nordstrom. Such conduct is incompatible with ERISA's fiduciary standards of loyalty and prudence.

44. Had Nordstrom provided participants with meaningful notice of the availability of a reasonable alternative standard, including clear instructions and contact information in *all* Plan materials referencing the surcharge as well as a notice of participants' rights to have their personal physician's recommendations accommodated, Plaintiffs and similarly situated individuals could have taken steps to avoid or reduce the unlawful tobacco surcharge. Defendant's failures on these fronts deprived participants of the opportunity to exercise their rights under ERISA and directly contributed to the financial harm suffered by the Class.

45. By intentionally failing to include notice in its benefit guides, by failing to provide *meaningful* notice in all Plan materials, by burying the few, partially compliant disclosures deep within an enormous electronic document lacking any header, title, or hyperlink related to the surcharge, and by including misleading and conditional language regarding the alternative standard in its SPD, Nordstrom has implemented a tobacco surcharge program that is both

discriminatory and unlawful. These deficiencies violate ERISA and its implementing regulations, deprive Nordstrom of the protection afforded by ERISA's wellness-program safe harbor, and constitute independent breaches of fiduciary duty under 29 U.S.C. §§ 1104 and 1106. Allowing corporate entities like Nordstrom to exploit their employees under the guise of "wellness" programs undermines the core purpose of ERISA: to protect participants from discrimination in health coverage. Nordstrom's conduct demonstrates how an employer can strategically use complexity, opacity, and electronic enrollment to conceal participants' rights, generate unlawful revenue, and defeat the very protections Congress intended to guarantee.

## III. DEFENDANT'S SELF-DEALING AND MISMANAGEMENT OF PLAN FUNDS

46. Nordstrom administers the tobacco surcharge by designating which participants are charged and withholding the surcharge directly from participants' paychecks as a before-tax plan contribution, alongside required premium deductions. The SPDs all makes clear that participants who do not indicate non-smoker status will pay an additional $20 biweekly Tobacco Use Surcharge. These deductions are part of the funding stream for Plan coverage, not separate penalties, and are treated the same way as other contributions made to support the Plan's medical benefit.

47. Because funding for the Plan comes from contributions from Nordstrom and the employee, Nordstrom created what should have been a third stream of funding available to the Plan: (1) participants' required premium contributions, (2) Nordstrom's promised company contribution amount, and (3) the additional tobacco surcharge. But instead of allowing all three funding streams to flow into the Plan, Nordstrom used the tobacco surcharge to offset its funding obligation. Because the cost of coverage for each participant is fixed, every dollar of surcharge collected reduced Nordstrom's contribution dollar-for-dollar. Thus, rather than increasing resources available to the Plan, the surcharge simply shifted costs away from Nordstrom and onto

participants. By applying surcharge proceeds to its own accounts, Nordstrom saves money it otherwise would have had to contribute as employer funding, and the Plan itself receives fewer overall contributions than it would have absent the surcharge

48. This practice constitutes classic self-dealing because Nordstrom manipulated the Plan's funding structure to realize savings for itself, depriving the Plan of the full benefit of the three distinct funding streams it should have received. This arrangement results in a clear loss to the Plan, not merely to individual participants. Every dollar of surcharge collected is one that Nordstrom does not need to contribute, reducing the pool of funds available to pay claims and administer benefits. The surcharge amounts are properly treated as part of Plan assets because they are deducted from employees' paychecks. *See* 29 C.F.R. § 2510.3-102 (employee contributions become Plan assets when withheld). By diverting those amounts to its own benefit, Nordstrom diminished the Plan's funding stream

49. In doing so, Nordstrom failed to act solely in the interest of participants and beneficiaries, as ERISA requires. Rather than use the surcharge proceeds to offset premiums for all participants or to strengthen the Plan's reserves, Nordstrom retained the amounts for itself. The result is a direct benefit to Nordstrom at the expense of the Plan's assets and participants' rights.

50. By structuring contributions in this way, Nordstrom engaged in prohibited self-dealing under 29 U.S.C. § 1106(b)(1). The surcharge revenue was used to reduce the employer's share of plan expenses, generating a windfall to Nordstrom and depriving the Plan of the full funding it should have received. These practices demonstrate that Nordstrom's wellness program was not a bona fide health promotion initiative but a revenue-generating mechanism, in direct violation of ERISA's fiduciary duty and anti-discrimination provisions.

## CLASS DEFINITION AND ALLEGATIONS

51. Plaintiffs bring this action individually and on behalf of all other similarly situated individuals, pursuant to Rule 23(b)(1) of the Federal Rules of Civil Procedure.

52. Plaintiffs propose the following Class definitions, subject to amendment as appropriate:

> **Tobacco Surcharge Class**
> All individuals residing in the U.S. who, from 2014 to the time of judgment, paid a tobacco surcharge in connection with their participation in a health or welfare plan offered by Defendant.

53. Excluded from the Class are Nordstrom's officers and directors, and judicial officers and their immediate family members and associated court staff assigned to this case.

54. Plaintiffs reserve the right to modify or amend the definitions of the proposed Class before the Court determines whether certification is appropriate.

55. The proposed Class meets the criteria for certification under Fed. R. Civ. P. 23(a) and (b)(1).

56. **Numerosity**. This action is appropriately suited for a class action. The members of the Class are so numerous that the joinder of all members is impracticable. Plaintiffs are informed, believe, and thereon allege, that the proposed Class contains thousands of participants who have been damaged by Defendant's conduct as alleged herein, the identity of whom is within the knowledge of Defendant and can be easily determined through Defendant's records.

57. **Commonality**. This action involves questions of law and fact common to the Class. The common legal and factual questions include, but are not limited to, the following:

a. Whether Defendant's tobacco surcharge discriminates against participants based on a health status related factor;
b. Whether Defendant offers a reasonable alternative standard by which a participant could receive the "full reward" of the tobacco surcharge;
c. Whether Defendant provided the proper notices of an alternative standard in *all* the plan materials describing the surcharge;
d. Whether Defendant's tobacco surcharge program violates ERISA and the applicable regulations;

e. Whether Defendant breached its fiduciary duties by misusing the collected surcharge amounts to offset Nordstrom's own contribution to the Plan;

f. Whether Defendant breached its fiduciary duties by failing to periodically review the terms of its surcharge program to ensure compliance with ERISA and applicable regulations; and

g. The appropriate mechanisms to determine damages on a class-wide basis.

58. **Typicality**. Plaintiffs' claims are typical of the claims of the members of the Class, because, *inter alia*, all Class members have been injured through the uniform misconduct described above and were charged improper and unlawful tobacco surcharge and retaliated against for not choosing an off-duty smoke free lifestyle. Moreover, Plaintiffs' claims are typical of the Class members' claims because Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all members of the Class. In addition, Plaintiffs are entitled to relief under the same causes of action and upon the same facts as the other members of the proposed Class.

59. **Adequacy of Representation**. Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs and members of the Class each participated in health and welfare plans offered by Defendant and were harmed by Defendant's misconduct in that they were assessed unfair and discriminatory tobacco surcharges. Plaintiffs will fairly and adequately represent and protect the interests of the Class and has retained competent counsel experienced in complex litigation and class action litigation. Plaintiffs have no interests antagonistic to those of the Class, and Defendant have no defenses unique to Plaintiffs.

60. **Superiority**. A class action is superior to other methods for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class members is relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendant. It would be virtually impossible for a member of the Class, on an individual basis, to obtain effective redress for the wrongs done to him

or her. Further, even if the Class members could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no management difficulties under the circumstances here.

61. Plaintiffs seek injunctive, declaratory, and equitable relief on grounds generally applicable to the Class. Unless the Class is certified, Defendant will be allowed to profit from its unfair and discriminatory practices, while Plaintiffs and the members of the Class will have suffered damages. Unless Class-wide injunctions are issued, Defendant may continue to benefit from the violations alleged, and the members of the Class will continue to be unfairly treated.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF ERISA'S WELLNESS PROGRAM RULES
### (Violation of 29 U.S.C. § 1182 & 42 U.S.C. § 300gg-4)

62. Plaintiffs re-allege and incorporate herein by reference allegations in paragraphs 1–61 of this Complaint.

63. Defendant unlawfully imposes a tobacco surcharge on Plan participants who use tobacco in violation of ERISA § 702 and the Public Health Service Act § 2705. By requiring employees to pay a $20 twice-monthly "Tobacco Use Surcharge" unless they affirmatively attest to being tobacco-free, and by failing to make available and notify participants of a compliant wellness program, Defendant discriminates based on a health-status-related factor in direct violation of 29 U.S.C. § 1182 and 42 U.S.C. § 300gg-4.

64. ERISA explicitly prohibits group health plans from requiring "any individual (as a condition of enrollment or continued enrollment under the plan) to pay a premium or contribution which is greater than such premium or contribution for a similarly situated individual enrolled in the plan on the basis of any health status-related factor." *See* 29 U.S.C. § 1182(b). The only limited exception to this prohibition applies to wellness programs that qualify as "programs of health promotion and disease prevention" under the Departments' joint Final Regulations. Those regulations set forth specific criteria that *must* be satisfied for a premium differential based on tobacco use to be lawful. 29 C.F.R. § 2590.702(f)(4).

65. Nordstrom's tobacco surcharge program does not meet all these requirements. The pre-2025 benefit guides—the materials employees actually use when electing health coverage—omit any notice of the availability of a reasonable alternative standard, provide no contact information for accessing it, and make no mention of the right to physician accommodation. The SPD, meanwhile, includes conditional and misleading language that conditions relief on *both* enrollment in a cessation program *and* submission of a "change in tobacco status," suggesting that participants must actually stop smoking before they can qualify for relief. This disclosure is not only inaccurate, and buried on page 53 of a 500+ page, single-spaced SPD without any headers to guide participants through the electronic enrollment process, it affirmatively misleads participants into believing cessation is the *only* path to avoid the surcharge.

66. Because Nordstrom failed to provide clear, consistent, and complete notice of a reasonable alternative standard in *all* Plan materials describing the surcharge, and because it imposed additional conditions and barriers that misled participants into believing cessation was required, its tobacco surcharge program is not a bona fide "program of health promotion and

disease prevention." Rather, it is a subterfuge for discrimination based on a health factor, in violation of ERISA § 702(b) and PHSA § 2705.

67. As a result, Defendant's program unlawfully imposes higher premiums on participants based on their health status, fails to provide the same full reward to all similarly situated individuals, and therefore cannot qualify for ERISA's statutory safe harbor.

68. Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), Plaintiffs seek all available and appropriate remedies to redress Defendant's violations of ERISA's anti-discrimination provisions outlined in § 1182(b) and § 300gg-4, including but not limited to injunctive relief, restitution, and any other relief necessary to remedy Defendant's unlawful conduct, as set forth in the Prayer for Relief.

**COUNT II**

**BREACH OF FIDUCIARY DUTY**

**(Violation of ERISA §§ 404 and 406, 29 U.S.C. §§ 1104 and 1106)**

69. Plaintiffs re-allege and incorporate herein by reference allegations in paragraphs 1–61 of this Complaint.

70. ERISA requires a fiduciary to act "solely in the interest of participants," to do so with "the care, skill, prudence, and diligence" of a prudent person, "in accordance with the documents and instruments governing the plan," and to refrain from "deal[ing] with the assets of the plan" in the fiduciary's own interest. 29 U.S.C. §§ 1104(a)(1); 1106(b)(1). These duties of loyalty and prudence are the "highest known to the law" and require fiduciaries to have "an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982). In this case, Nordstrom's fiduciary obligations included a continuing duty to monitor its wellness program for compliance with federal law, to correct known deficiencies,

and to ensure that participants received complete and accurate information about their rights under the Plan.

71. Instead of loyally and prudently acting in the best interests of Plan participants, Defendant chose to use Plan assets to exclusively benefit itself, to the detriment of the Plan and its participants, by unlawfully withholding millions of dollars in tobacco surcharges from participants' paychecks and using these funds to offset its own obligations to contribute to the Plan. The surcharges functioned as an undisclosed source of profit for Nordstrom, reducing its required employer contributions dollar-for-dollar and generating a windfall that directly benefited the company at the expense of its employees and the Plan. By designing the surcharge program in a manner that predictably maximized company savings rather than participant benefits, Nordstrom transformed what should have been additional assets for the Plan into an offset, effectively converting Plan assets into corporate gain.

72. Each year, Defendant administered the Plan within the meaning of 29 U.S.C. § 1002(16) and was a fiduciary within the meaning of 29 U.S.C. § 1002(21), in that it exercised discretionary authority and discretionary control respecting the management of the Plan and its surcharge programs, including the decision not to offer a reasonable alternative standard. Each year, Defendant exercised discretionary authority with respect to the administration and implementation of the unlawful surcharge program by administering a wellness program without providing reasonable alternatives that allowed "all similarly situated individuals" to avoid the surcharge for the entire plan year, dictated the eligibility criteria and penalties for noncompliance, and failed to provide participants with the necessary notices.

73. Nordstrom controlled and disseminated to all employees the contents of the Benefits Guides describing the tobacco surcharge but failed to notify participants of a reasonable

alternative standard by which they could avoid the entire year of surcharges regardless of when they satisfied the alternative standard in violation of the regulations. Further, Nordstrom failed to adequately and regularly review the terms of its tobacco wellness program and the accompanying communications to participants to ensure they complied with ERISA and the regulations. Year after year, Defendant failed to properly institute safeguards against administering a program that violated the statute and implementing regulations. Nordstrom's concealment of critical information, like the right to a reasonable alternative standard and the role of personal physician recommendations, constitutes a material omission that breached its duty of loyalty by depriving participants of the ability to make informed decisions about their health coverage. These actions reflect Nordstrom's active role in administering a non-compliant "program[] of health promotion and disease prevention," resulting in an unlawful and discriminatory tobacco surcharge in violation of ERISA.

74. Nordstrom also breached its fiduciary duties by administering a Plan that did not conform with ERISA's anti-discrimination requirements. Nordstrom acted disloyally by causing Plaintiffs and members of the Class to pay tobacco surcharges that were unlawful because they were associated with a non-compliant wellness program.

75. As a result of the imposition of the unlawful and discriminatory tobacco surcharges, Nordstrom enriched itself at the expense of the Plan, resulting in it receiving a windfall. Defendant breached its fiduciary duties by prioritizing its own financial interests over the interests of Plan participants by deducting from participants' paychecks the amounts of the surcharges without properly administering reimbursements to individuals who completed the wellness program in the second half of the Plan year. By administering the wellness program in a manner that precluded "all similarly situated individuals" from obtaining the "full reward," and by failing to adequately

disclose participants' rights under tobacco wellness program, Nordstrom administered a program that disproportionately benefited itself at the expense of Plan participants. This practice resulted in an unjust enrichment to Nordstrom at the expense of Plan participants, demonstrating a failure to act solely in the interests of participants and beneficiaries, in violation of ERISA's duty of loyalty under 29 U.S.C. § 1104(a)(1)(A).

76. Further, by withholding unlawful tobacco surcharges from participants' paychecks and using those funds to reduce its own financial obligations to the Plan, Nordstrom caused the Plan to engage in transactions that constituted a direct or indirect exchange of Plan assets for the benefit of a party in interest—namely, itself—and improperly used Plan assets for its own financial advantage, in violation of 29 U.S.C. § 1106(a)(1). Nordstrom is a party in interest, as that term is defined under 29 U.S.C. § 1002(14), because it is both a Plan fiduciary and the employer of Plan participants.

77. By retaining the amounts of the tobacco surcharges, Nordstrom increased its own monies and saved the money it would have had to contribute to the Plan. In doing so, it dealt with Plan assets for its own benefit, in violation of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1), which prohibits fiduciaries from engaging in self-dealing and using plan assets for their own benefit. By retaining the surcharges without providing participants with the "full reward" to which they are entitled, Nordstrom improperly benefitted from its own wellness programs at the expense of Plan participants. These acts constitute classic self-dealing because Nordstrom, as both Plan sponsor and fiduciary, used its dual role to structure transactions that benefited itself financially while diminishing Plan assets.

78. Defendant breached its fiduciary duties by: failing to properly disclose material information about the wellness programs to participants, thereby misleading or depriving them of

the ability to make informed decision; administering a wellness program that does not conform with ERISA's anti-discrimination provisions, in violation of ERISA § 404, 29 U.S.C. § 1104(a)(1)(D); acting on behalf of a party whose interests were averse to the interests of the Plan and the interests of its participants (and their beneficiaries), in violation of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(2); and by failing to act prudently and diligently to review the terms of the wellness programs (and the Plan) and Plan communications to ensure they properly complied with the regulatory requirements in violation of 29 U.S.C. § 1104(a)(1)(B). These breaches caused Plaintiffs and the Class to incur unlawful and discriminatory surcharges. Had Defendant conformed with their fiduciary duties under ERISA, they would not have administered a non-compliant wellness program and/or would have reviewed the terms of the Plan and the wellness program regularly to ensure they complied with ERISA's anti-discrimination provisions and would have updated the Plan and/or wellness program and associated communications to comply with the law. Taken together, Nordstrom's failures to disclose, monitor, and correct its unlawful wellness program, as well as its misuse of Plan assets, reveal a pattern of fiduciary misconduct that was not merely negligent but systemic, reflecting a prioritization of corporate savings over the rights of its employees.

79. As a direct and proximate result of these fiduciary breaches, members of the Class lost millions of dollars in the form of unlawful surcharges that were deducted from their paychecks.

80. Plaintiffs are authorized to bring this action on a representative basis on behalf of the Plan pursuant to 29 U.S.C. § 1132(a)(2). Plaintiffs are also permitted, in the alternative, to bring a claim under 29 U.S.C. § 1132(a)(3). Pursuant to 29 U.S.C. § 1109, Defendant is liable to: make good to the Plan all losses resulting from their breaches; disgorge unjust enrichment and ill-

gotten profits; and restore to the Plan, or to a constructive trust for the Plan, all profits acquired through their violations.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that judgment be entered against Defendant on all claims and request that the Court awards the following relief:

A. An Order certifying this action as a class pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiffs as Class representatives for the Class, and appointing the undersigned to act as Class Counsel;

B. A declaratory judgment that the unlawful and discriminatory tobacco surcharges imposed on participants violate ERISA's anti-discrimination provisions set forth in ERISA § 702, 29 U.S.C. § 1182;

C. An Order instructing Defendant to reimburse all persons who paid the unlawful and discriminatory surcharges;

D. A declaratory judgment that Defendant breached their fiduciary duties in violation of ERISA § 404, 29 U.S.C. § 1104 for, *inter alia*, instituting a surcharge on participants without offering a reasonable alternative standard in violation of ERISA's anti-discrimination provisions and for failing to adequately monitor the terms of the Plan and wellness program, as well as communications with participants, to ensure they complied with ERISA and the applicable regulations;

E. An Order requiring Defendant to provide an accounting of all prior payments of the surcharges under the Plan;

F. Declaratory and injunctive relief as necessary and appropriate, including enjoining Defendant from further violating the duties, responsibilities, and obligations imposed on it by ERISA with respect to the Plan and ordering Defendant to remit all previously collected surcharges;

G. Disgorgement of any benefits or profits Defendant received or enjoyed due to the violations of ERISA § 702, 29 U.S.C. § 1182(b);

H. Restitution of all surcharge amounts Defendant collected;

I. Surcharge from Defendant totaling the amounts owed to participants and/or the amount of unjust enrichment obtained by Defendant as a result of its collection of the unlawful and discriminatory tobacco surcharges;

J. Relief to the Plan from Defendant for its violations of ERISA § 404, 29 U.S.C. § 1104, under 29 U.S.C. § 1109, including a declaration that the tobacco surcharges are unlawful; restoration of losses to the Plan and its participants caused by Defendant's fiduciary violations; disgorgement of any benefits and profits Defendant received or enjoyed from the use of the Plan's assets or violations of ERISA; surcharge; payment to the Plan of the amounts owed to members who paid the surcharges; removal and replacement of the Plan's fiduciaries, and all appropriate injunctive relief, such as an Order requiring Defendant to stop imposing the unlawful and discriminatory surcharges on participants in the future.

K. An award of pre-judgment interest on any amounts awarded to Plaintiffs and the Class pursuant to law;

L. An award of Plaintiffs' attorneys' fees, expenses, and/or taxable costs, as provided by the common fund doctrine, ERISA § 502(g), 29 U.S.C. § 1132(g), and/or other applicable doctrine; and

M. Any other relief the Court determines is just and proper.

Dated: October 10, 2025

Respectfully submitted,

**SIRI & GLIMSTAD LLP**

*/s/ Oren Faircloth*

Oren Faircloth (*pro hac vice*)
Willian Payne (*pro hac vice* forthcoming)
745 Fifth Avenue, Suite 500
New York, New York 10151
Tel: (212) 532-1091
E: ofaircloth@sirillp.com
E: wpayne@sirillp.com

David B. Richardson, WSBA #21991
3829 S. Edmunds St., Suite C
Seattle, WA 98118
Phone: (425) 646-9801
Email: david@dbrlaw.com

*Attorneys for Plaintiffs and the Proposed Class*